**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANNA SASAKI, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FAY NUTRITION, LLC | |
| Defendant. | |

Plaintiff Anna Sasaki ("Plaintiff") brings this class action lawsuit, individually and on behalf of all others similarly situated (the "Class Members") against Defendant Fay Nutrition, LLC ("Defendant" or "Fay Nutrition"). Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and upon information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all U.S. residents who accessed and navigated www.faynutrition.com (the "Website") and whose electronic communications were intercepted or recorded through the advertising technology provided by third parties including Google, LLC ("Google"), TikTok, Ltd. ("TikTok"), Meta Platforms, Inc. ("Meta" or "Facebook"), and LinkedIn Corporation ("LinkedIn") (collectively, the "Third Parties").

2. When booking health services online, patient privacy is crucial. Patients expect, as they should, that their information will be held in confidence and not shared with third parties without their knowledge or consent. This is especially true for those seeking the services of a dietician, considering the stigma associated with dietary choices as well as any medical

conditions that may prompt a patient to seek the services of a dietician. The inherently sensitive nature of such services amplifies the need for privacy during online booking process.

3. "A registered dietitian or registered dietitian nutritionist (RD or RDN) is a credentialed healthcare professional. They use their knowledge of nutrition to create meal plans that lead to better health."[1]

4. Fay Nutrition helps patients book appointments with board-certified nutritionists and registered dietitians covered by insurance.[2]

5. Healthcare providers and business associates thereof—including Defendant—are legally required to safeguard patients' confidential and sensitive health information. This means that any data related to patients' dietary needs and treatment history, including patient status, must be kept confidential and secure. Given these protections, patients reasonably expect that information related to their nutritional needs and treatment will remain confidential.

6. As a HIPAA covered entity, Defendant has legal and ethical duties to protect patient information. Nonetheless, Defendant undermined the importance of safeguarding the identities and personal medical information of individuals seeking nutrition-related services and breached its patients' trust—violating state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA").

7. In pursuit of profit and without regard for patient privacy Defendant aids, agrees with, employs, conspires, or otherwise enables Third Parties to eavesdrop on communications sent and received by Plaintiff and Class Members on the Website, including communications that contain protected health information ("PHI") and personally identifiable information ("PII"). By

---

[1] CLEVELAND CLINIC, *Dietitian,* https://my.clevelandclinic.org/health/articles/dietitian.

[2] FAY NUTRITION, *Let insurance pay for your nutrition counseling*, https://www.faynutrition.com/.

failing to procure consent before enabling Third Parties to intercept these communications, Defendant violated state and federal law including the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. §2511, *et seq.*) and the California Invasion of Privacy Act ("CIPA") §§ 631 and 632.

## PARTIES

*Plaintiff*

8.     Plaintiff Anna Sasaki is a citizen of California residing in Long Beach, California.

9.     At all relevant times, Plaintiff maintained active Google, Facebook, TikTok, and LinkedIn accounts.  When registering for her Google, Facebook, TikTok, and LinkedIn accounts, each Third Party required that she provide her PII, including her full name, gender, date of birth, phone number, and/or email address.  Plaintiff used the same device to access the Website that she did to access her Google, Facebook, TikTok, and LinkedIn accounts.

10.     Additionally, every time Plaintiff accesses her Google account, Google collects information related to her IP address and electronic device (*e.g.*, browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes.  Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed below.  Google utilizes all these tracking features in order to build robust consumer profiles it can then leverage for targeted advertising purposes.

11.     In or around January 2025, while in California, Plaintiff accessed the Website to make an appointment with a registered dietitian for nutritional services.

12.     Unbeknownst to Plaintiff, Defendant intercepted and disclosed her PHI— including specific details regarding her location, insurance provider, and the specific health

3

conditions she was seeking services for[3]—through tracking software provided by the Third Parties for targeted advertising purposes. Defendant also disclosed sufficient PII for Third Parties to identify Plaintiff as the specific individual booking her dietitian appointment, as described more thoroughly below. After booking an appointment on Defendant's Website, Plaintiff began receiving targeted advertisements for similar products and services. Plaintiff would not have booked an appointment on the Website if she knew Defendant was violating her privacy by sharing her PHI and PII with unknown third parties.

*Defendant*

13. Defendant Fay Nutrition, LLC is an Illinois-based Limited Liability Company headquartered in this District.

14. Defendant develops, owns, and operates the Website. The Website connects patients with licensed nutritionists and registered dietitians in all 50 states, virtually or in-person.

15. Defendant intentionally implemented Google Analytics, the TikTok Pixel, the Meta Pixel, and the LinkedIn Insight Tag (collectively the "Tracking Technologies") on the Website, whereby the Tracking Technologies intercepted and disclosed the confidential PII and PHI of its patients with Third Parties.

## JURISIDICTION AND VENUE

16. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq* ("ECPA"). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people

---

[3] The specific information provided by Plaintiff has been intentionally omitted to protect her privacy.

comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from Defendant, so this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005.

17.     This Court has personal jurisdiction over the parties because Defendant is an Illinois LLC, Defendant resides in this District, and Plaintiff submits to the jurisdiction of the Court.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendant resides in this District.

## FACTUAL ALLEGATIONS

**A.     Health Information is Sensitive and Confidential**

19.     Defendant owns and operates the Website, where patients can book appointments with licensed nutritionists and registered dietitians for health services, including general and specialized nutrition care for a wide array of medical conditions.

20.     Under federal law, healthcare providers—including nutritionists and dietitians—and their business associates—like Defendant—may not disclose PII or PHI without the patient's express written authorization.

21.     The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, which establishes the duties healthcare providers and their business associates owe to their patients.  "The Rule requires

appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[4]

22.     A covered entity violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." [5]

23.     The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id.*

24.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant because it is knowingly and intentionally disclosing individually identifiable health information relating to its patients.

25.     Defendant further failed to comply with other HIPAA safeguard regulations as follows:

   a.   Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

   b.   Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

---

[4] U.S. Dept. of Health & Hum. Servs., The HIPAA Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[5] 42 U.S.C. § 1320d-6.

    c.   Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

    d.   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

    e.   Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

    f.   Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

26.    HIPAA covered entities, like Defendant, may use third-party tracking tools in a limited way to perform analysis on data key to operations. However, they are not permitted to use these tools in a way that may expose patients' PHI to vendors (as shown below). As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. *For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.*[6]**

27.    The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft,

---

[6] U.S. DEPT. OF HEALTH & HUM. SERVS., USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added).

financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[7]

28.     Plaintiff and Class Members face exactly the risks which the government expresses concern over.  Defendant's unlawful conduct resulted in third parties intercepting information regarding Plaintiff and Class Members' nutrition-related health appointments when they accessed Defendant's Website to book appointments for nutrition-related services.

29.     The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

> This information might include an individual's medical record number, home or email address, ***or dates of appointments, as well as an individual's IP address or geographic location,*** medical device IDs***, or any unique identifying code.***[8]

30.     Crucially, the Bulletin continues:

> ***All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI***, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as ***IP address or geographic location***, does not include specific treatment or billing information like dates and types of health care services.  This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus ***relates to the individual's past, present, or future health or health care*** or payment for care.[9]

---

[7] *Id.* (emphasis added).

[8] *Id.* (emphasis added).

[9] *Id.* (emphasis added).

31.     In July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app. In their letter, both agencies ***reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties***. For example, the disclosure of such information could ***reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.*** [10]

---

[10] FED. TRADE COMM'N, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, Jul. 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (emphasis added).

32.     The FTC is unequivocal in its stance.  The FTC has specifically informed HIPAA covered entities, like Defendant, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce.  This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.

> For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.

> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[11]

33.     Therefore, Defendant's conduct, as described herein, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

**B.      Overview of the California Invasion of Privacy Act and the Federal Wiretap Act**

34.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

---

[11] FED. TRADE COMM'N, COLLECTING, USING, OR SHARING CONSUMER HEALTH INFORMATION? LOOK TO HIPAA, THE FTC ACT, AND THE HEALTH BREACH NOTIFICATION RULE, https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach.

35.     The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

36.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its **simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.**
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

37.     As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct."  *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978).  Specifically, CIPA § 631(a) prohibits any person or entity from:

(i)     "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";

(ii)    "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or

(iii)   "us[ing], or attempt[ing] to use . . . any information so obtained."

38.     CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

39.     Individuals may bring an action against a violator of CIPA § 631 for $5,000 per

violation.  Cal. Penal Code § 637.3.

40.     In a manner similar to CIPA, the Federal Wiretap Act (i.e., the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[12]

41.     Although the ECPA does not apply "where one parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[13]

### C.     Overview of Digital Tracking Technologies

42.      Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (*e.g.*, computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

43.     Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

44.     Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- <u>HTTP Request</u>: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also

---

[12] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[13] 18 U.S.C. § 2511(d).

send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

45.     A consumer's HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

46.     Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

47.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The tracking technologies embedded on the Website by Defendant, including Google Analytics, the TikTok Pixel, the Meta Pixel, and the LinkedIn Insight Tag, constitute Source Code and function in a substantially similar way to the process described above.

D.     **Google's Tracking Technologies**

48.     Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars.  Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

49.     Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[14]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

50.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

---

[14] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at
https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

51.     One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

52.     Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

53.     In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

54.     Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet.  Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

55.     Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[15]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions

---

[15] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.

with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[16]

56.     Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when Fay Nutrition patients are booking their appointments.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

57.     In other words, when interacting with the Website, an HTTP Request is sent to Defendant's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google Analytics.

58.     The Defendant is essentially handing its patients a tapped device.  Once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for Defendant, and transmits those communications to third parties like Google.

59.     Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing.  Google Analytics

---

[16] *Id.*

enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

60. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

61. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

62. The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the dietician and nutritionist appointments being scheduled by the patient. Google also received the reason for the appointment as well as additional PII, including the patients' IP address, device information, and User-IDs.

63. For example, the Website utilizes Google's "cid" or "Client ID" function to identify patients as they navigate the Website.[17]

---

[17] Eduard Kozakov, *What Is Google Client ID In GA4: Detailed Setup Guide For 2024*, OWOX, https://www.owox.com/blog/use-cases/google-analytics-client-id.

64.     In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

65.     These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

66.     As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[18]

67.     The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[19]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

68.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[20]

69.     Browser-fingerprints are personal identifiers.  Google Analytics can collect browser-fingerprints from website visitors.

---

[18] Justin Schuh, *Building a more private web*, GOOGLE, https://blog.google/products/chrome/building-a-more-private-web/.

[19] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY, https://www.pixelprivacy.com/resources/browser-fingerprinting.

[20] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017) https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

70.     As enabled by Defendant, Google collects vast quantities of consumer data through Google Analytics.

71.     Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and User-IDs it intercepts and link such information to an individual's specific identity.

72.     Google then utilizes such information for its own purposes, such as targeted advertising.

**E.     TikTok's Tracking Technologies**

73.     TikTok offers a SaaS called the TikTok Pixel, which helps businesses track the performance of their ads by sending information from the business's website to TikTok, who then uses that information to optimize ad campaigns on TikTok and across the internet.[21]

74.     The TikTok pixel can be "plugged in" to any website, as the pixel is a piece of code that can be added to any website to capture "events" (any activity by a user that happens on a website).

75.     The TikTok Pixel is part of a package of prebuilt software tools under the "TikTok for Business" product line that allow the delivery of personalized ads.  By employing TikTok to collect user information through the TikTok Pixel, websites that procure TikTok's services can use the information to deliver more effective targeted advertisements, increasing revenue for the websites.

76.     In short, when users interact with a webpage with the TikTok Pixel installed, the TikTok Pixel collects the "Metadata and button clicks" (information about what the user clicked on—such as the specific URL address visited by the user— or text entered into the webpage), a

---

[21] "TikTok Pixel 101: What It Is & How to Use It," https://popupsmart.com/blog/tiktok-pixel

timestamp for the event, and the visitor's IP address.[22]  That information is sent automatically to TikTok.

77.     The "TikTok for Business" business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the TikTok Pixel.

78.     Thus, through websites that employ TikTok's services, TikTok directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

79.     On each appointment page and booking page on Defendant's Website (where the TikTok Pixel is installed), TikTok collects the URL value of the page visited, an identification code TikTok uses to track the user, and the visitor's browser type and operating system.

80.     When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because TikTok itself is collecting the content of any conversation.  That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendant).

81.     Once TikTok intercepts website communications, it has the capability to use such information for its own purposes.  TikTok's Commercial Terms of Service grant TikTok "a non-exclusive, royalty-free, worldwide, transferable, sublicensable license to access, use, host, cache,

---

[22] *About TikTok Pixel*, TikTok Business Help Center (Mar. 2025)
https://ads.tiktok.com/help/article/tiktok-pixel?redirected=2).

store, display, publish, distribute, modify and adapt [information collected from partner websites] in order to develop, research, provide, promote, and improve TikTok's products and services."[23]

82.     In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that TikTok can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing TikTok to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new TikTok Business products and services, or improve pre-existing TikTok Business products and services.

83.     One of TikTok's partners is Fay Nutrition.  The TikTok Pixel is employed on the Website in the manner described throughout this Complaint.

### F.     Meta's Tracking Technology

84.     Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising,[24] bringing in an excess of $160 billion in 2024.[25]

85.     Meta's advertising business began back in 2007 with the creation of "Facebook

---

[23] *TikTok For Business Commercial Terms Of Service*, TikTok For Business, https://ads.tiktok.com/i18n/official/
policy/commercial-terms-of-service (Last updated March 2025).

[24] Emmanuel Oyedegi, *Meta's ad business generated 98% of its total revenue in Q2 2025*, Techloy (Jul. 31, 2025) https://www.techloy.com/metas-ad-business-generated-98-percent-of-its-total-revenue-in-q2-2025/.

[25] Stacy Jo Dixon, *Meta's ad business generated 98% of its total revenue in Q2 2025*, Statista (Jan. 30, 2025) https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_
uQ_ https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_
uQ_

Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads." [26]

86.     Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 3 billion active users. [27]

87.     Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level. "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" [28]

88.     Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising services. Meta generates substantially all of its revenue from selling advertisement placements:[29]

**Table 2:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

[26] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[27] Naveen Kumar, *Facebook Users Statistics (2025) – Latest Worldwide Data*, DEMANDSAGE (Aug. 19, 2015) https://www.demandsage.com/facebook-statistics/.

[28] Natasha Singer, *What You Don't Know About How Facebook Uses Your Data*, NEW YORK TIMES (Apr. 11, 2018) https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

[29] *Facebook Ad Revenue (2017–2027)*, OBERLO, https://www.oberlo.com/statistics/facebook-ad-revenue.

89.     One of Meta's most powerful advertising tools is the Meta Pixel, formerly known as the Facebook Pixel, which launched in 2015 and its SDK.

90.     Meta touted the Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."[30]

91.     The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

92.     Through this technology, Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website and what they searched. The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

93.     This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's Website, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

---

[30] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

94.     For example, Meta uses cookies named c_user, datr, fr and fbp to identify its account holders.  Meta stores or updates Meta-specific cookies every time a person accesses their Facebook account from the same web browser.

95.     The Meta Pixel can access these cookies and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's website inputs.

96.     The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one – and only one – unique c_user cookie.  Facebook uses the c_user cookie to record user activities and communications.

97.     A User's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures, personal interests, work history, relationship status, and other details.  Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's corresponding Facebook profile.  To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

98.     The Facebook datr cookie identifies the User's web browser.  It is an identifier unique to each person's specific web browser and is another way Facebook can identify Facebook users.

99.     The Facebook fr cookie is a combination of the Facebook ID (c_user) and the browser ID (datr) cookie values.

100.    A User who accessed Defendant's Website while logged into (or recently having logged into) Facebook would have their browser transmit the c_user, datr and fr cookies to

Facebook.

101.    At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.

102.    Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click and view related to the shopping and products sought from Defendant).

103.    Meta can also link the data to a specific user through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

104.    Lastly, Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Using Manual Advanced Matching the website developer manually sends data to Meta to link users. Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.[31]

105.    Importantly, even if Meta Pixel collects data about a non-Facebook user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.[32]

---

[31] While Meta purports to "hash" the PII provided by patients, Meta actually uses the hashed format *specifically to link the Meta Pixel data to Facebook profiles*.

[32] Jürgen Graf, *Investigating shadow profiles: The data of others*, TECHXPLORE (Sept. 22, 2023) https://techxplore.com/news/2023-09-shadow-profiles.html.

106.     At the time Plaintiff used Defendant's Website, she maintained active social media account on Facebook.  Plaintiff accessed the Defendant's Website from the same device she used to visit Facebook, and Meta associated the data it collected about her from Defendant's Website with her Facebook account and other PII.

107.     Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase." By tracking these events developers can measure ad performance and build audiences for ad targeting.[33]

108.     Meta's SDK collects three types of App Events.  Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases."  Standard Events are "popular events that Facebook has created for the app."  Custom Events are "events [the app developers] create that are specific to [the] app."[34]

109.     Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and analytics to reach these individuals through future Facebook ads.  For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match members of the audiences' criteria.[35]

110.     In addition to using the data intercepted through Meta Pixel and SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising

---

[33] *Meta App Event Tracking*, META, https://developers.facebook.com/docs/app-events/.

[34] *Meta App Event Tracking: Overview*, META, https://developers.facebook.com/docs/app-events/.https://developers.facebook.com/docs/app-events/overview.

[35] *Audience Network*, META, https://developers.facebook.com/docs/app-events/overview.https://developers.facebook.com/docs/audience-network/.

network, and machine-learning algorithms, including by improving its ability to identify and target users.

111. Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

112. According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . at it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?" [36]

113. In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation." [37] Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

114. Meta's own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used. In a recent court hearing as part of the Cambridge Analytica scandal of 2018, Meta's own engineers testified there was not a "single person" at Meta who could answer that question. [38]

---

[36] Lorenzo Franceschi-Bicchierai, *Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document*, VICE, (Apr. 26, 2022) https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/.

[37] *Id.*

[38] Isober Asher Hamilton, *Senior Facebook engineers say no one at the company knows where your data is kept*, BUSINESS INSIDER, (Sept. 8. 2022) https://www.businessinsider.com/meta-doesnt-know-where-all-your-data-is-engineers-say-2022-

115.    Defendant uses at least the Meta Pixel on its Website. As a result, Defendant disclosed and Meta intercepted users'—including Plaintiff's—interactions on the Website. Meta received at least the patient's insurance, location, and medical condition which it could associate with embedded cookies to associate the information with the patient's identity. Meta and Defendant used this data, as well as other data uploaded directly to Meta by Defendant, so that Defendant could run advertisements using its services.

### G.    LinkedIn's Tracking Technology

116.    LinkedIn markets itself as "the world's largest professional network on the internet[.]"[39] But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network. LinkedIn has moved into the marketing and advertising space and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[40] Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[41]

117.    According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement,

---

9#:~:text=Two%20Meta%20engineers%20were%20grilled,there%20for%20almost%20nine%20years.

[39] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441.

[40] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[41] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

and ultimately, higher conversion rates."[42]  Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[43]  LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience.  The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[44]

118.    As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[45]

119.    The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, Predictive Audience, and LinkedIn Audience Network.[46]

120.    Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allow marketers and

---

[42] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[43] LINKEDIN, *supra* note 41.

[44] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[45] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[46] *See id.*

advertisers, including healthcare providers and insurance companies, to target potential customers.[47]

121.    For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[48]  According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement.  However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting.  This increases the impact of our advertising."[49]

---

[47] LinkedIn, Privacy Policy, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LinkedIn, Account Targeting, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LinkedIn, Examples of Trending and Best-in-Class Healthcare Campaigns and Content, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LinkedIn, Healthcare social media strategies for 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[48] LinkedIn, Account Targeting, https://business.linkedin.com/marketing-solutions/ad-targeting.

[49] LinkedIn, LinkedIn Audience Network, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

122.    In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[50] That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[51]

123.    According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[52] LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[53]

124.    LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[54] A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[55] LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[56] Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn. Doing so ensures that the third-party cookie-blocking functions of

---

[50] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings

[51] Dencheva, *supra* note 41.

[52] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[53] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[54] LINKEDIN, *supra* note 45.

[55] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[56] *See id.*

modern web browsers do not prevent LinkedIn from collecting data through its software.[57] Instead, the LinkedIn Insight Tag is shielded with the same privacy exemptions offered to first-party cookies.

125. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

126. These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

127. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[58]

128. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[59] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[60]

129. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it obtains through the LinkedIn Insight Tag, which Defendant installed on the Website, LinkedIn is able to target its account holders for advertising.

130. LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact,

---

[57] *See id.*

[58] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[59] *See id.*

[60] *See id.*

LinkedIn expressly warrants the opposite. Similarly, Defendant never receives consent from its customers to share information with LinkedIn.

131. When signing up, a user agrees to the User Agreement.[61] By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[62] and the Cookie Policy.[63]

132. LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[64]

133. The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[65] LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[66]

134. However, LinkedIn offers an express representation: "We will only collect and process personal data about you where we have lawful bases."[67]

---

[61] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[62] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[63] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[64] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[65] *Id.*

[66] *Id.*

[67] *Id.* (emphasis added).

135.     Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

**H.     Defendant Uses The Tracking Technologies To Violate The Privacy Rights of its Patients**

136.     Fay Nutrition owns and operates the Website, which offers patients a variety of nutrition health services, such as treatments for eating disorders, food allergies and sensitivities, weight loss, diabetes, cancer/oncology, and general nutrition.[68]

137.     Contrary to the representations made on its Website, Defendant fails to comply with its obligations under HIPAA.

138.     Defendant, via the Website, allows its patients to book appointments.  However, unbeknownst to patients booking appointments via the Website, their personally identifiable and protected health information is being disclosed to third parties.

139.     For example, by embedding the Tracking Technologies onto the Website, Defendant intercepts and discloses sensitive details about their patients' confidential nutritionist appointments and personally identifiable information to Google, TikTok, Meta, and LinkedIn including appointment location, insurance provider, and medical condition.  *See* Figs. 1–5.

---

[68] FAY NUTRITION, https://www.faynutrition.com/.



**Figure 1:** Website User Interface



**Figure 2:** Interceptions by Google
(confirmable with developer tools)



**Figure 3:** Interceptions by TikTok
(confirmable with developer tools)



**Figure 4:** Interceptions by Meta
(confirmable with developer tools)



**Figure 5:** Interceptions by LinkedIn (confirmable with developer tools)

140.    Once patients book their appointment, Defendant further discloses the location of

the appointment, the date of the appointment, and whether the appointment is virtual or in-person

to Google and TikTok. *See* Figs. 6–8.



**Figure 6:** Website User Interface



**Figure 7:** Interceptions by Google



**Figure 8:** Interceptions by TikTok

141.     Defendant also permits Meta to intercept a "complete registration" event, wherein it confirms a patient is booking an appointment with a nutrition on Defendant's Website, which it ties to the patient's fbp identifier and is sent along with the patient's c_user cookie. *See* Fig. 9.



**Figure 9:** Interceptions by Meta

142. Defendant also assists LinkedIn with receiving a "conversion" event, where it once again discloses an appointment is being booked, and the patient's insurance carrier. *See* Fig. 10.

Full call
https://px.ads.linkedin.com/collect?
v=2&fmt=js&pid=7779842&time=1758921768261&li_adsId=2b3762f0-f5d4-4677-b451-
58338dcda4cf&conversionId=22793162&url=https%3A%2F%2Fprovider.faynutrition.com%2Fappoin
tments%2Fembed_appt%3Fdietitian_id%3Db8765213-f8f3-42f2-87e1-
4d46158ae27b%26insurance%3Daetna&tm=gtmv2

**Figure 10:** Interceptions by LinkedIn

143. Defendant further assists Google disclosing the PII of its patients sufficient for Google to uncover their identities. For instance, in HTTP communications, the patient's IP address is inherently included in every network request. In addition to patient IP addresses, Defendant, through Google Analytics, disclosed information about its specific devices and User-IDs to Google, allowing Google to link such information to an individual's specific identity.

144. Defendant also uses and causes the disclosure of data sufficient for Google to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications about their appointment details.

145. Defendant sent these identifiers (*e.g.*, cid, IP address, and device information) with each patient's "event" data.

146. Defendant discloses Plaintiff's personal information to TikTok by sending her PHI and PII, contemporaneously, with the unique identifier cookie _ttp, which matches website events to TikTok advertisements.[69]

147. Similarly, Defendant discloses Plaintiff's personal information to Meta by sending her PHI and PII, contemporaneously, with the unique identifier fbp cookie, which

---

[69] *TikTok Cookies Policy,* TIKTOK, https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en.

matches website events to Facebook account holders.[70]

148. Defendant also discloses Plaintiff's PHI and PII contemporaneously with a unique identifier from the LinkedIn Insight Tag, including the li_sugr and lms_ads cookies, which LinkedIn uses to match events to LinkedIn users.

149. Such event data includes the fact that a patient is seeking medical treatment (*i.e.*, nutrition-related services).

150. When patients share their personal information with medical professionals, they expect this information to be kept confidential. Moreover, when consumers seek a specific treatment from medical professionals, they also expect this highly sensitive information to be kept confidential.

151. If patients knew Defendant was sharing their personal information for targeted advertising purposes, they would book appointments with licensed nutritionists and registered dietitians with another service. Through the above-listed third-party tracking services, which Defendant used via the software code installed, integrated and embedded into the Website, Defendant unlawfully disclosed its patients' legally protected PII and PHI.

152. By installing, integrating and embedding Google Analytics, the TikTok Pixel, the Meta Pixel and the LinkedIn Insight Tag into the Website, and by directing such installation, integration and embedding, Defendant aided and conspired with the third parties and others to allow those third-party entities to contemporaneously and surreptitiously intercept the Website communications of Defendant's patients without the patient's consent.

153. Defendant engages in this deceptive conduct for its own profit at the expense of

---

[70] *TikTok Cookies Policy,* TIKTOK, https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en.

their patients' privacy. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and are in violation of federal and state law.

## CLASS ACTION ALLEGATIONS

154. **Class Allegations:** Plaintiff brings this action individually and on behalf of a putative nationwide class defined as: All individuals residing in the United States booked an appointment on the website, www.faynutrition.com, during the Class Period (the "Class").

155. Plaintiff also seeks to represent a subclass defined as: All individuals residing in California who booked an appointment on the website, www.faynutrition.com, during the Class Period (the "California Subclass").

156. The Class and California Subclass are referred to collectively as the "Classes."

157. The Classes are ascertainable because the Class members can be identified by objective criteria – all individuals who accessed the Website to book an appointment with a licensed nutritionist or registered dietitian for nutrition-related services. Individual notice can be provided to Class members "who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).

158. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

159. Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

160.     Plaintiff reserves the right to amend the definitions of the Class or Subclass and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

161.     Excluded from the Classes is Defendant, the officers and directors of the Defendant at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which either Defendant has or has had a controlling interest.

162.     Plaintiff is a member of the Classes she seeks to represent.

163.     **Numerosity:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time.  However, it is estimated that there are at least thousands of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendant's records and records from the Third Parties.

164.     **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes.  The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members.  Such questions include, but are not limited to, the following:

   a.   Whether Defendant's acts and practices violated the ECPA;

   b.   Whether Defendant's acts and practices violated CIPA § 631;

   c.   Whether Defendant's acts and practices violated CIPA § 632;

   d.   Whether Defendant gave the Class members a reasonable expectation of privacy that their information was not being shared with third parties;

e.   Whether Defendant's disclosure of information constitutes a violation of the claims asserted;

f.   Whether Plaintiff and Class members are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

g.   Whether Plaintiff and Class members have sustained damages as a result of Defendant's conduct and if so, what is the appropriate measure of damages or restitution.

h.   Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

165.   **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the Plaintiff, like all other class members, accessed the Website and had her confidential electronic communications intercepted and disclosed to Third Parties.

166.   **Adequacy:** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

167.   **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

168. Plaintiff reserves the right to revise her allegations and class definition based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CAUSES OF ACTION

### COUNT I
### Violation of the Electronic Communications Privacy Act ("ECPA")
### 18 U.S.C. § 2511(1), *et seq.*
### (On Behalf of the Class)

169. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

170. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

171. The ECPA protects both the sending and receipt of communications.

172. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

173. The transmission of Plaintiff's PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

174.     The transmission of PII and PHI between Plaintiff and Class members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

175.     The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

176.     The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

177.     The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

178.     The following instruments constitute "devices" within the meaning of the ECPA:

a.     The computer codes and programs Third Parties used to track Plaintiff and Class members communications while they were navigating the Website;

b.     Plaintiff's and Class members' browsers;

c.     Plaintiff's and Class members' mobile devices;

d.     Defendant's and the Third Parties' web and ad servers;

e.     The plan Defendant and Third Parties carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they were using a web browser to navigate the Website.

179. Plaintiff and Class members' interactions with Defendant's Website are electronic communications under the ECPA.

180. By utilizing and embedding Third Party Tracking Technologies on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

181. Specifically, Defendant intercepted Plaintiff's and Class members' electronic communications through the Tracking Technologies, which tracked, stored and unlawfully disclosed Plaintiff's and Class members' PII and PHI to third parties, including Google, TikTok, Meta, and LinkedIn.

182. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class members regarding PII and PHI, including their treatment information. This confidential information was then matched to patients' accounts with the Third Parties and monetized for targeted advertising purposes.

183. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

184. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

185. Defendant intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPAA and invasion of privacy, among others.

186. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

187. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider . . . (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[71]

188. Plaintiff's information that Defendant disclosed to Third Parties qualifies as IIHI, and Defendant violated Plaintiff's and Class members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used the wire or electronic communications to increase its profits. Specifically, Defendant intentionally embedded and used Google Analytics, the TikTok Pixel, the Meta Pixel,

---

[71] 42 U.S.C. § 1320d-6.

and the LinkedIn Insight Tag to track and utilize Plaintiff's and Class members' PII and PHI for financial gain.

189.     Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

190.     Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy through Google Analytics, the TikTok Pixel, the Meta Pixel, and the LinkedIn Insight Tag.  Plaintiff and Class members, all of whom are patients of Defendant, had a reasonable expectation that Defendant would not redirect their communications to Google, TikTok, Meta, and LinkedIn without their knowledge or consent.

191.     Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation. 18 U.S.C. § 2520.

### COUNT II
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631(a)**
**(On Behalf of the California Subclass)**

192.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

193.     The California Invasion of Privacy Act (the "CIPA") is codified at California Penal Code Sections 630 to 638.  The CIPA begins with its statement of purpose—namely, that the purpose of the CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . ."  Cal. Penal Code § 630.

194.     A person violates California Penal Code Section 631(a), if:

47

by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . .[72]

195.     Further, a person violates section 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph.  *Id.*

196.     To avoid liability under section 631(a), a defendant must show it had the consent of ***all*** parties to a communication.

197.     At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiff's and Class Members' internet communications while using the Website to book appointments.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

198.     Defendant, while aiding and assisting Google, TikTok, Meta, and LinkedIn's wiretapping, intended to help them learn some meaning of the content in the URLs and the content the visitors requested.

199.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Google Analytics, the TikTok Pixel, the Meta Pixel, and the LinkedIn Insight Tag fall under the broad catch-all category of "any other manner":

---

[72] Cal. Penal Code § 631(a).

a. The computer codes and programs Google, TikTok, Meta, and LinkedIn used to track Plaintiff and Class Members' communications while they were navigating www.faynutrition.com;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' computing and mobile devices;

d. Google, TikTok, Meta, and LinkedIn's web and ad servers;

e. The web and ad servers from which Google, TikTok, Meta, and LinkedIn tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.faynutrition.com;

f. The computer codes and programs used by Google, TikTok, Meta, and LinkedIn to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.faynutrition.com; and

g. The plan Google, TikTok, Meta, and LinkedIn carried out to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile device to visit www.faynutrition.com.

200. At all relevant times, Google, through Google Tracking Technology, intentionally tapped or made unauthorized connections with the lines of internet communications between Plaintiff and Class Members and the Website without the consent of all parties to the communication.

201. At all relevant times, TikTok, though TikTok Pixel, intentionally tapped or made unauthorized connections with the lines of internet communications between Plaintiff and Class Members and the Website without the consent of all parties to the communication.

202. At all relevant times, Meta, through the Meta Pixel, intentionally tapped or made unauthorized connections with the lines of internet communications between Plaintiff and Class Members and the Website without the consent of all parties to the communication.

203. At all relevant times, LinkedIn, through the LinkedIn Insight Tag, intentionally tapped or made unauthorized connections with the lines of internet communications between Plaintiff and Class Members and the Website without the consent of all parties to the communication.

204. Google, willfully and without the consent of Plaintiff and Class Members, read or attempted to read, or learn the contents or meaning of Plaintiff's and Class Members' communications to Fay Nutrition while the communications are in transit or passing over any wire, line or able, or were being received at any place within California when it intercepted Plaintiff's and Class Members' communications and data with Fay Nutrition.

205. TikTok, willfully and without the consent of Plaintiff and Class Members, read or attempted to read, or learn the contents or meaning of Plaintiff's and Class Members' communications to Fay Nutrition while the communications are in transit or passing over any wire, line or able, or were being received at any place within California when it intercepted Plaintiff's and Class Members' communications and data with Fay Nutrition.

206. Meta, willfully and without the consent of Plaintiff and Class Members, read or attempted to read, or learn the contents or meaning of Plaintiff's and Class Members' communications to Fay Nutrition while the communications are in transit or passing over any

wire, line or able, or were being received at any place within California when it intercepted Plaintiff's and Class Members' communications and data with Fay Nutrition.

207.    LinkedIn, willfully and without the consent of Plaintiff and Class Members, read or attempted to read, or learn the contents or meaning of Plaintiff's and Class Members' communications to Fay Nutrition while the communications are in transit or passing over any wire, line or able, or were being received at any place within California when it intercepted Plaintiff's and Class Members' communications and data with Fay Nutrition.

208.    Google used or attempted to use the communications and information they received through their tracking technology, including to supply advertising services.

209.    TikTok used or attempted to use the communications and information they received through their tracking technology, including to supply advertising services.

210.    Meta used or attempted to use the communications and information they received through their tracking technology, including to supply advertising services.

211.    LinkedIn used or attempted to use the communications and information they received through their tracking technology, including to supply advertising services.

212.    By incorporating the Tracking Technologies onto the Website, Defendant aided, agreed with, employed, and conspired with the Third Parties to carry out the wrongful conduct alleged herein.

213.    The patient communication information that Fay Nutrition transmitted using the Tracking Technologies, such as patient status, insurance information, and preexisting medical conditions, constituted protected health information.

214.    As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of $5,000 dollars per violation or three times the amount of actual

damages, whichever is greater. Additionally, California Penal Code Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

215. Under the CIPA, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT III**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632(a)**
**(On Behalf of the California Subclass)**

216. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

217. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication".

218. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

219. Plaintiff's and Class Members' communications to Defendant, including their sensitive personal and health information, such as information related to their prescription medications, were confidential communications for purposes of § 632, because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

220. Plaintiff and Class Members expected their communications to Fay Nutrition to be confined to Fay Nutrition due to the confidential nature of those communications. Plaintiff

and Class Members did not expect third parties, specifically Google, TikTok, Meta, and LinkedIn, to secretly eavesdrop upon or record this information and their communications.

221.    Google's tracking technology, i.e., Google Analytics, is an electronic amplifying or recording devices for purposes of § 632.

222.    TikTok's tracking technology, i.e., the TikTok Pixel, is an electronic amplifying or recording devices for purposes of § 632.

223.    Meta's tracking technology, i.e., the Meta Pixel, is an electronic amplifying or recording devices for purposes of § 632.

224.    LinkedIn's tracking technology, i.e., the LinkedIn Insight Tag, is an electronic amplifying or recording devices for purposes of § 632.

225.    By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to Fay Nutrition through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

226.    At no time did Plaintiff or Class Members consent to the Third Parties' conduct, nor could they reasonably expect that their communications to Fay Nutrition would be overheard or recorded by the Third Parties.

227.    Google, TikTok, Meta, and LinkedIn utilized Plaintiff's and Class Members' sensitive personal and health information for their own purposes, including for targeted advertising.

228.    Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount

of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

229.     Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts.  Plaintiff's and Class Members' sensitive data has been collected, viewed, accessed, stored, by Third Parties, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law.  Plaintiff and Class Members are accordingly entitled to injunctive relief.

**COUNT IV**
**Negligence**
**(On Behalf of the Class and California Subclass)**

230.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

231.     Plaintiff brings this claim on behalf of herself and members of the Classes against Defendant.

232.     Defendant knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII and PHI, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, misused, and disclosed to unauthorized parties.

233.     As a provider of health care under the law, Defendant had a special relationship with Plaintiff and Class members who entrusted Defendant to adequately protect their PII and PHI.

234.     Defendant knew that the PII and PHI at issue was private and confidential and should be protected as private and confidential.  Thus, Defendant owed a duty of care not to subject Plaintiff and Class Members to an unreasonable risk of unauthorized disclosure.

235.    Defendant knew, or should have known, of the risks inherent in collecting and storing PII and PHI and allowing it to be accessed by unauthorized third parties.

236.    Defendant's failure to take proper security measures to protect Plaintiff's and Class Members' PII and PHI created conditions conducive to a foreseeable risk of unauthorized access and disclosure of such confidential information to unauthorized third parties.  As described above, Plaintiff and Class Members are part of a foreseeable, discernable group that was at high risk of having their confidential information compromised, and otherwise wrongly disclosed if not adequately protected by Defendant.

237.    Defendant had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

238.    Defendant owed a duty to timely and adequately inform Plaintiff and Class Members that their PII and PHI was being improperly disclosed to unauthorized third parties.

239.    Defendant systematically failed to provide adequate security for data in its possession or over which it had supervision and control.

240.    Defendant, through its actions and omissions, unlawfully breached duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII and PHI within Defendant's possession, supervision, and control.

241.    Defendant, through its actions and omissions, unlawfully breached duties owed to Plaintiff and Class members by failing to have appropriate procedures in place to prevent dissemination of Plaintiff's and Class Members' PII and PHI.

242.    Defendant, through its actions and omissions, unlawfully breached duties to timely and fully disclose to Plaintiff and Class Members that the PII and PHI within Defendant's possession, supervision, and control was improperly accessed by unauthorized third parties, the nature of this access, and precisely the type of information improperly accessed.

243.    Defendant's breach of duties owed to Plaintiff and Class Members proximately caused Plaintiff's and Class Members' PII and PHI to be compromised by being accessed by unauthorized third parties.

244.    As a result of Defendant's ongoing failure to adequately notify Plaintiff and Class Members regarding what type of PII and PHI has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages.

245.    As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiff and Class members to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

246.    In failing to secure Plaintiff's and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice.  Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights.  Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Classes.

247.    Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class members' PII and PHI,

and as a result, Plaintiff and Class members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

### COUNT V
### Breach of Confidence
### (On Behalf of the Nationwide Class and California Subclass)

248.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

249.    Plaintiff brings this claim on behalf of herself and Class and Subclass members against Defendant.

250.    Medical providers have a duty to their patients to keep non-public medical information completely confidential.

251.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

252.    Contrary to its duty as a medical provider and covered entity and its express promises of confidentiality, Fay Nutrition installed the Tracking Technologies to disclose and transmit Plaintiff's and Class Members' communications, including their PII and PHI, to unauthorized third parties, like Google, TikTok, Meta, and LinkedIn.

253.    These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

254.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

57

255. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

    a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

    c. Defendant eroded the essential confidential nature of the provider-patient relationship;

    d. General damages for invasion of their rights in an amount to be determined by a jury;

    e. Nominal damages for each independent violation;

    f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

    g. Plaintiff and Class members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

    h. Defendant's actions diminished the value of Plaintiff's and Class Members' PII and PHI; and

    i. Defendant's actions violated the property rights Plaintiff and Class Members have in their PII and PHI.

<u>**COUNT VI**</u>
**Unjust Enrichment**
**(On Behalf of the Class and California Subclass)**

256. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

257. Plaintiff brings this claim on behalf of herself and members of the Classes against Defendant.

258. Defendant benefit from the use of Plaintiff's and Class members' PII and PHI and unjustly retained those benefits at their expense.

259. Plaintiff and Class members conferred a benefit upon Defendant in the form of PII and PHI that Defendant collected from Plaintiff and Class members, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

260. Defendant unjustly retained those benefits at the expense of Plaintiff and Class members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class members.

261. The benefits that Defendant derived from Plaintiff and Class members was not offered by Plaintiff and Class members gratuitously and rightly belongs to Plaintiff and Class members. It would be inequitable under unjust enrichment principles in Illinois and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

262. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VII
### Breach of Implied Contract
### (On Behalf of the Class and California Subclass)

263. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

264. Plaintiff brings this claim on behalf of herself and members of the Classes against Defendant.

265. As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiff and Class members provided their PII and PHI and compensation for their nutrition therapy.

266. When Plaintiff and Class members provided their PII and PHI to Defendant, they entered into implied contracts pursuant to which Defendant agreed to safeguard and not disclose their PII and PHI without consent. Plaintiff and Class members would not have entrusted Defendant with their PII and PHI in the absence of an implied contract between them and Defendant, obligating Defendant to not disclose PII and PHI without consent.

267. Defendant breached these implied contracts by disclosing Plaintiff's and Class members' PII and PHI to Third Parties. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of their PII and PHI.

268. Plaintiff and Class members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the proposed Classes, that the Court enter judgment in her favor and against Defendant as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative for the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b)     For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)     For actual, compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: September 29, 2025        Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:     */s/ Alec M. Leslie*
       Alec M. Leslie

Alec M. Leslie
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck
701 Brickell Avenue, Suite 2100

Miami, FL 33133
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
Email: sbeck@bursor.com

*Counsel for Plaintiff*